**DUNBAR MOLASSES CORPORATION v. HOME INS. CO. OF NEW YORK.**

**No. 4927.**

District Court, E. D. New York.

April 27, 1933.

Crowell & Rouse, of New York City (E. Curtis Rouse, of New York City, of counsel), for plaintiff.

Macklin, Brown, Lenahan & Speer, of New York City (Paul Speer, of New York City, of counsel), for defendant.

BYERS, District Judge.

This is an action at law, a jury having been waived, in which the plaintiff seeks to recover for the loss of molasses in bulk, the result of escape of a portion thereof from a broken section of a pipe line leading from the plaintiff's storage tank to a valve at the dock where a ship lay in which the cargo was laden; the valve was connected with the ship's hose leading over the ship's side.

The loss occurred at New Orleans on September 16, 1930.

The insurance contract is an open policy issued March 20, 1930, and consists of a printed form attached to which is a printed rider containing twenty-one paragraphs, some of which contain typewritten matter; attached to the printed rider are three typewritten riders; there are also two separate typewritten riders attached to the printed policy.

The printed contract recites that the defendant insures the plaintiff from "ports * * * in the World to ports * * * in the World generally via any route * * *, including risks of transhipment and lighterage, whether customary or otherwise."

The subject-matter is "lawful goods and merchandise, consisting principally of *molasses* shipped per iron or steel steamer * * *, and connecting conveyances, by land or otherwise, but excluding sailing vessels * * *, except as a connecting conveyance."

Insurance commences upon the merchandise "from the time when the Goods or Merchandise shall be laden on Board the said Ship * * * and until the said Goods and Merchandise be discharged and safely landed as above."

Further, "No risk on shore is covered by this Policy unless specifically assumed in writing, but when any risk on shore is so specifically assumed by this Policy, it is agreed that if thereby this Policy attaches on board railroad cars, the risks of fire, derailment and collision only are covered * * *; and if thereby this Policy attaches on board any other land conveyance, or on docks, wharves, or elsewhere on shore, the risks of fire and rising navigable waters or river floods only are covered." (This must be read in connection with paragraphs 9, 20 and 21 of the rider.)

The policy is agreed not to cover more than $175,000.00 in any one casualty.

The foregoing provisions occur in the printed body of the contract, which counsel have referred to as the basic policy.

The principal rider, so far as material, is as follows:

The effective date is agreed to be March 15, 1930, to continue until cancellation.

Coverage is of goods and merchandise, principally molasses, valued at "sales price," shipped per iron or steel steamer "and connecting conveyances, by land or otherwise, but excluding sailing vessels * * *, ex-

cept as a connecting conveyance"; "from ports * * * in the World to ports * * * in the World generally, via any route * * *, including risks of transhipment and lighterage, whether customary or otherwise."

Paragraph 9: "Including while on docks, wharves or elsewhere on shore and/or during land transportation, risks of collision * * *, or any accident to the conveyance and/or collapse and/or subsidence of docks, and to pay loss or damage caused thereby, even though the insurance be otherwise F. P. A."

Paragraph 10: "All goods shipped are insured:

"A. As attached.

"Molasses in bulk insured:

"Warranted free from particular average unless the vessel * * * and/or the interest hereby insured be stranded, sunk, burnt, on fire, or in collision, but not liable for leakage unless the vessel be stranded, sunk, burnt, on fire or in collision, * * *, or same be caused by explosion or by the vessel coming into contact with any floating or stationary object and provided in all the above cases that the leakage shall amount to over one (1%) percent, a deduction to be made from all settlements of one-quarter of one (1%) percent allowance for ordinary leakage. The contents of each tank shall be considered as separately insured. * * *

"D. Notwithstanding any average warranty contained herein, these insurers agree to pay landing * * * charges * * *, as well as any partial loss arising from transhipment. * * *"

Paragraph 11: "Including risks of craft to and from the vessel, each lighter, craft or conveyance to be considered as if separately insured. * * *"

Paragraph 14: "In case of short shipment in whole or in part by the vessel reported for insurance hereunder, * * *, this insurance shall nevertheless cover the goods until safe arrival and delivery at destination, provided prompt notice be given these insurers when such facts are known to the assured, and additional premium paid if required."

Paragraph 19: "It is a condition of this insurance that the assured is bound to declare to Johnson & Higgins for transmission to these insurers, as soon as practicable * * *, each and every shipment coming within the terms hereof, whether arrived or not, underwriters being bound to accept same up to but not exceeding the limit hereinbefore agreed. It is also agreed that this insurance shall not be prejudiced by any unintentional delay or omission in reporting hereunder or any unintentional error in the amount * * *, if prompt notice be given these insurers as soon as said delay and/or omission and/or error becomes known to the assured."

Paragraph 20: "It is further agreed that the conditions contained herein shall override anything that may be at variance or contradictory thereto in the policy to which this form is attached."

Paragraph 21: "Other conditions, if any:- Attaching from the time the molasses is waterborne and covers continuously while in due course of transit until safely landed at port of destination including risk of loading and unloading."

It is recited that this insurance cancels and takes the place of a previous policy issued by the defendant, bearing the same number, and dated August 1, 1928.

The plaintiff's plant is located in the City of New Orleans, near the east bank of the Mississippi River, and tanks and buildings are from several hundred feet to more than 1,000 feet from the river.

On September 16, 1930, the S. S. Amolco was lying at the Congress Street wharf at New Orleans, loading molasses, which was pumped from shore tank No. 5 through a 10-inch pipe to the vessel.

The pipe in question runs mostly underground to the wharf at which the steamer lay, where it emerges and is carried by stringers, which also support the wharf planking, to the valve above referred to, where the ship's hose was made fast. The distance from No. 5 tank to the wharf is more than 1050 feet, and the pipe carrying the molasses was therefore somewhat longer than that.

During the night of September 16–17, it was discovered that the ship was not receiving molasses; whereupon it developed that a portion of the pipe under the wharf had fallen to the bank or batture as it is called, and that, through a break in the pipe, much of the molasses had flowed over the batture and into the river. Thereupon the ship was shifted to another wharf about a thousand feet up the river, where loading was resumed, and continued until 8:30 p. m. on the 17th, and the ship sailed about an hour later for Baltimore.

This cargo was declared under the policy in suit under date of September 25, 1930,

on a form of declaration prepared by the plaintiff's brokers, which recites a shipment for insurance by the plaintiff; the blank provided for the "Name of Vessel and/or other Conveyances" reads "Per S. S. 'Amolco' #16 Date of B/L September 17th, 1930," and the merchandise was described as 827,217 gallons of molasses valued at $36,858.00. This bore the typewritten signature "Dunbar Molasses Corporation" and underneath, in script, "F. J. Chester." The figure 16 above referred to indicated the number of the voyage.

It will be observed that there is no reference in the declaration to the pipe line in question as a conveyance.

Promptly upon discovery of the said loss, the defendant was notified, and its surveyor surveyed the broken pipes without prejudice on September 18, 1930. On September 27, 1930, the defendant notified the plaintiff's brokers, in effect, that the loss did not fall under the policy, and the subsequent dealings of the parties during the ensuing six months are not recorded in any correspondence which is in evidence.

On May 1, 1931, the defendant wrote to its brokers, explaining that the declaration was insufficient as to the quantity of cargo shipped, because the figure therein stated was an estimate upon which the bill of lading was issued; it was explained that the precise figures were obtained by measuring the contents of the shore tank from which the molasses was pumped, at the time that the operation started and again when it ceased; the difference being the amount discharged from the tank. Consequently, a correction slip, increasing the number of gallons from 827,217 to 991,068, was prepared and delivered to the defendant by the brokers for the plaintiff under date of May 7, 1931.

The testimony shows that this correction slip was delivered to the marine underwriter for the defendant, and at that time there was a conversation between the plaintiff's representative and the latter, involving the methods employed in calculating the amount of cargo according to the original declaration, and then under the correction slip.

The marine underwriter understood at this time that there had been a loss, and says that he did not know the details thereof. The correction slip was held under advisement until June 4, 1931, at which time it was accepted; he knew that there was talk about a claim, and he presumed that a claim was going to be filed on the corrected declaration, and he knew that his company had held a survey of the damage.

Under date of June 8, 1931, a claim was filed for this loss, and thereafter correspondence, which is in evidence, indicates that from June 22, 1931, until October 2, 1931, the parties were in communication, and that the defendant refused to recognize the validity of plaintiff's claim under the policy.

During the month of February, 1932, this action was brought.

The first question at issue is whether the insurance attached to the molasses while it was in the pipe line between the shore tank and the valve to which the ship's hose was coupled.

This policy took the place of an earlier one issued in 1928, and by its terms covered molasses in bulk, which means that the parties must have contracted with mutual knowledge of the circumstances attending the operation of loading molasses into a vessel. It is only by ascribing such knowledge to them that light can be thrown upon their intentions in employing the words of the basic policy referring to the carrying vessel "and connecting conveyances by land or otherwise," which likewise occur in paragraph 6 of the rider; the same comment is thought to apply to the provisions of paragraph 21 of the rider, to the effect that the insurance attaches from the time that the molasses is waterborne, "including risk of loading and unloading." Nor should sight be lost of paragraph 9 in the rider, above quoted, in which reference is made to the molasses while on docks or elsewhere on shore and/or "during land transportation * * * or any accident to the conveyance and/or collapse and/or subsidence of docks * * *, even though the insurance be otherwise F. P. A."

Paragraph 20 (the overriding provision) renders the foregoing of great importance, for obviously it provides for liability which would not be present under the terms of the basic policy.

These several provisions would not be appropriate unless the parties had clearly in mind that the marine insurance was to cover the operation of loading the cargo, and thus the question seems to come down to where the loading began. Was it at the tank from which the molasses was pumped, or was it at the dock valve to which the ship's hose was attached?

The answer to this question must be sought in a consideration of the operation itself.

It is necessary to disregard mere questions of distance such as length of pipe line, and the position of pumps and tanks with reference to the wharf.

The conclusion would be the same whether the tank was two feet from the wharf or two thousand.

The testimony is that the output of tank No. 5 was released through a valve on the tank itself; there was a pump in the same yard, containing suction and discharge valves, and this pump furnished the first impulse to move the molasses toward the ship; its efforts were aided by a "booster" pump located 500 feet or so nearer the wharf; delivery proceeded through the pipe line which has been described, which was connected with the filling and discharge line (the ship's flexible hose), and the cargo pumps were used as booster pumps "to expedite the loading."

It must be clear that the operation of loading was started by opening the valve in the tank, and was stopped by closing it. Unless molasses were permitted to remain in the pipe line on storage, the opening and closing of the valve to which the ship's hose was connected could not control the operation. There is no testimony which would indicate that molasses was kept on storage in the pipe line, ready to be drawn off by opening the valve at the river end of the line as the occasion might require, as one would draw a glass of water from a faucet.

Thus the loading must be deemed to have had its inception at tank No. 5, and to have continued until further output was there cut off.

To this reasoning, the defendant offers objections which require examination:

A. The basic contract in terms provides that the insurance shall commence from the time that the cargo is laden on board the ship, and "connecting conveyances by land or otherwise"—therein recited—necessarily refer only to such instrumentalities as shall function after the cargo has been so laden.

This argument necessarily ignores the provisions of paragraph 21 of the rider to the effect that the insurance attaches from the time the cargo is waterborne "including the risk of loading and unloading." True the defendant urges that the cargo must first be waterborne before liability exists, and that only thereafter the "loading and unloading" responsibility arises. If the word "unloading" alone were employed, the argument would be tenable, but, however inconvenient it may be to the defense of this action, the fact remains that the parties contracted with reference to "loading," and, as the cargo had to be loaded before it could become waterborne, it would seem inevitable that any loss incident to loading falls within the precise engagement.

Bluefields Fruit & S. S. Co. v. Western Assurance Co. of Toronto (C. C. A.) 265 F. 221, relied upon by the defendant, decides nothing to the contrary.

There the vessel to be laden suffered damage, requiring extensive repairs, and consequently was unable to accept a cargo of bananas on barges ready for delivery. No other vessel was available, and the cargo was lost through spoilage. The decision was that the bananas were not insured until laden on board the ship which was to receive them, and consequently her misadventure gave rise to no liability to the owner of the bananas, under the terms of the policy involved. The Court did not pass upon a loss during the process of loading, under insurance which attached, "including risk of loading and unloading."

B. The striking out of paragraph 8 of the rider indicates that the parties excluded such a happening as this.

The deleted provision follows: "Including (subject to the terms of this policy) all risks covered by this policy from the moment the goods and/or merchandise leave the store, warehouse or factory at initial point of shipment (whether in the interior or at the seaboard) while in due course of transit, until safely delivered into store, warehouse or factory at final destination, except that on shipments to the River Plate the risk of fire under this insurance shall cease upon arrival at any shed (transit or otherwise), store, Custom House or warehouse, or upon expiry of ten (10) days subsequent to landing, whichever may first occur."

While the loss in question would seem to have fallen within the above, it does not follow that the exclusion of the risks so described determines the question at issue; the express assumption of risk of loading, found in paragraph 21 of the rider, must be held to have been the affirmative engagement of the defendant which applies to this state of facts.

Also it may well be argued that the provisions of paragraph 9 of the rider, quoted above, were regarded as appropriate to cover the process of loading which was here contemplated. This cargo was on shore, and was in the process of transportation, i. e., being borne from the tank to the ship, in the pipe

line, and was lost through accident to the latter which took place during the operation. It is urged that the pipe line was not a "conveyance" within the meaning of this clause.

To this it may be answered that, since the parties contracted with a knowledge of how the plaintiff conducted the loading of its cargoes, if there had been a desire to exclude pipe lines as conveyances, appropriate language to that end would have been adopted.

One dictionary definition of the word is "That by which anything is conveyed" (Standard)—a sufficiently comprehensive expression to justify the construction here adopted. Thus, for present purposes, a pipe line is held to have been a "conveyance."

These objections therefore cannot be thought to diminish the undertaking by the defendant to cover the risk of loading the cargo in question.

It is then argued that the F. P. A. clause in paragraph 10 of the rider does not permit the plaintiff to recover for this partial loss. When this clause is read in connection with paragraph 9, it will be perceived that the latter includes a loss caused by an accident to a conveyance, even though the insurance be otherwise free from particular average.

The loss therefore is seen to have been a provable claim, even though it be conceded, for the sake of the argument, that in the absence of paragraph 9 this would not be the case.

The defendant insists that the proof was filed as for a partial loss. Manifestly this is so, because it was not total, and the fact that it credits the defendant with one-quarter of one percent. of the loss, as would have been done if it had been based upon a partial loss of the cargo after being laden on board, and the vessel had been stranded or in collision, does not mean that the plaintiff thereby conceded that it was a partial loss for which recovery could be had only pursuant to paragraph 10 of the rider.

There is nothing in the statement of claim to identify the loss with that paragraph, save the "deduction of ¼% allowance for ordinary leakage."

At most, the foregoing may be construed as an admission that any partial loss would be subject to a deduction for leakage; the admission may be conceded, and is binding upon the plaintiff to the extent that its prayer for judgment is so limited, but it does not go so far as to preclude an assertion that the loss was contemplated by paragraph 9 of the rider, nor can the Court thereby be relieved of the duty to examine the contention and, if need be, direct a judgment in accord with it.

The defendant urges that paragraph 9 of the rider, if permitted to support the plaintiff's claim, would thereby override paragraph 21, heretofore considered. The argument, that the latter must be taken to exclude all risks prior in time to the completion of placing the cargo on board, has been considered and found to be untenable. It is that contention alone which would support the view that paragraph 9 overrides paragraph 21 of the rider.

It is probably unnecessary to cite authority for the proposition that all parts of the policy are to be read together and brought into harmony if that be possible; fragmentary construction would serve no useful purpose.

If the views are sound which have previously been stated, that risks attending loading were deliberately contracted for, with knowledge of the plaintiff's methods thereby involved, it becomes apparent that the two clauses in question are not in conflict, and that no problem of overriding is involved. The term "loading" in paragraph 21 is merely to be interpreted with reference to the more elaborate reference to the possible incidents thereof as portrayed in the earlier article. Such is the theory upon which this decision is based.

It results therefore that the plaintiff is entitled to recover for its loss under this policy.

The plaintiff has sought to base its loss upon the stipulated sales price of molasses at Baltimore, of 10½ cents per gallon c. i. f. Baltimore. The freight on the molasses lost, at 1½ cents per gallon, would have been $3,351.16, had the molasses incurred the freight, which was not the fact.

By a parity of reasoning to that adopted in The Nat Sutton (C. C. A.) 62 F.(2d) 787, at page 790, it is held that the plaintiff's claim must be reduced by so much, there having been no certificate issued by the defendant valuing this shipment.

The plaintiff may have judgment against the defendant for $20,165.77, with interest from September 16, 1930, together with its costs and disbursements.