**UNITED STATES of America,**
Plaintiff,

v.

**EDWIN B. STIMPSON COMPANY, Inc.,**
Defendant.

**Civ. No. 13338.**

United States District Court
E. D. New York.

Sept. 27, 1957.

Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., Lloyd H. Baker, Asst. U. S. Atty., Brooklyn, N. Y., of counsel, for U. S.

Gabriel E. Torre, New York City, for defendant.

ZAVATT, District Judge.

This is a civil action brought under Section 409 of the Defense Production Act of 1950, as amended (50 U.S.C.A. Appendix, § 2109), to recover damages for alleged violations by the defendant of Ceiling Price Regulation 47, which was issued pursuant to said Act on June 21, 1951 and which became effective June 26, 1951. This regulation was in full force and effect during all of the times stated in the complaint.

The preamble or "Statement of Considerations" of Regulation 47 recites that it was issued to meet a critical shortage of scrap metal during the Korean incident and to overcome certain abuses in the trade by virtue of which sellers of brass mill scrap were receiving prices for such scrap metal which reflected metal values in excess of prevailing prices for virgin metal.

"As in the case of virtually all scrap metals, however, the outbreak of hostilities in Korea and the inauguration of our defense program upset this customary relationship

and the prices for brass mill scrap rose more sharply than the prices for new metal. During the base period of the General Ceiling Price Regulation (December 19, 1950, to January 25, 1951, inclusive) the market for brass mill scrap was extremely chaotic and some sellers were able to obtain prices for scrap which reflected metal values in excess of the prices prevailing for new metal. Thus while new copper was selling at 24½ cents per pound, brass mills were compelled to pay as much as 28 cents or more per pound for copper in scrap. Similarly, 70/30 Yellow Brass scrap having a value, in terms of new metal prices, of 22½ cents a pound was selling for as much as, and in some cases more than, 26 cents per pound.

"This abnormal price relationship, reflected in ceiling prices established under the General Ceiling Price Regulation, has disrupted the normal flow of scrap and is causing some hardship to consumers. These circumstances, and the accompanying uncertainty and confusion among both buyers and sellers, constitutes a serious threat to the continued output of brass mill products essential to both the defense program and the civilian economy.

"The ceiling prices established by this regulation are designed to correct this situation by rolling back the ceiling prices for brass mill scrap to a level which will restore, generally, the same cents per pound differential between the prices for such scrap and the prices for new metal which prevailed in the period preceding the Korean crisis."

Section 4(1) of the Regulation fixes the ceiling prices for the various grades of brass mill scrap "f.o.b. point of shipment * * * when sold by any person other than a dealer * * *".

The "Statement of Considerations" of the Regulation recognizes the fact that deliveries of brass mill scrap in relatively large quantities ordinarily command some premiums over deliveries in lesser amounts and, in order to encourage the sale of brass mill scrap in large quantities, it permits sellers of such scrap metal to charge a quantity premium, in addition to the ceiling prices, under certain circumstances.

"Although there does not appear to be any customary trade practice in the marketing of brass mill scrap insofar as quantity premiums are concerned, it does appear that deliveries in relatively large quantities ordinarily command some premiums over deliveries in lesser amount. In recognition of this fact and in order to encourage the accumulation and distribution of needed brass mill scrap, the regulation establishes certain premiums for a delivery or series of deliveries in specified quantities."

The circumstances under which quantity premiums are authorized and the amount of such premiums are provided in Section 4(2) of the Regulation as follows:

"(2) Quantity premiums. In addition to the ceiling prices determined in accordance with subparagraph (1), of this paragraph, the quantity premiums set forth in Table B may be charged if the seller, within a period of three consecutive calendar days (excluding Saturdays, Sundays, and legal holidays) delivers from one or more shipping points the specified quantity of material (i) to a public carrier for transportation to the buyer's receiving point, (ii) to the buyer at his receiving point in a conveyance owned or controlled by the seller, or (iii) upon a conveyance owned or controlled by the buyer. The amount of material delivered during any calendar day may be counted only once in determining whether a quantity premium may be charged.

"Whether a delivery or series of deliveries qualifies for a quantity

premium shall be established on the basis of the actual weight of brass mill scrap determined at the buyer's receiving point. The weight of con- tainers, dunnage, or other tare may not be included in determining whether a quantity premium may be charged.

Table B

| Quantity: | Premium per pound of scrap (cent) |
|---|---|
| 20,000 to 40,000 pounds | ½ |
| 40,000 pounds or more | 1." |

In this case, there is no claim that the defendant violated the established ceiling prices specified in Section 4(1), but, rather, that it violated Section 4(2) of the Regulation because it charged a quantity premium of 1¢ per pound on all sales of brass mill scrap under circumstances which did not entitle the defendant to charge the quantity premium.

During the past 105 years the defendant has been and still is engaged in the business of manufacturing and selling metal products, particularly eyelets, rivets, grommets and fasteners. Its place of business is in the Eastern District of New York. It pruchases virgin metal from several mills, including Volco Brass and Copper Company, of Kenilworth, New Jersey, and Waterbury Rolling Mills, Inc., of Waterbury, Connecticut. Its purchases of such metals, in 1952, aggregated approximately $1,000,000 and its gross sales during that year were in excess of $6,000,000. The two supplying mills above named sold and delivered virgin brass to the defendant, which they delivered to the defendant's place of business in large, heavy-duty, open boxes which are described in the trade as "skids" and are the property of the supplying mills. After the virgin metal was removed from these boxes at the defendant's place of business, the boxes remained there until the defendant had filled them with residual scrap which results from the defendant's manufacture of metal products. The defendant accumulated brass mill scrap at the rate of approximately 10,000 pounds per day. It baled this scrap into briquets, each of which it weighed, tagged and placed into one of the boxes owned by one of the supplying mills. At some time there-

after it sold quantities of this scrap, so stored, to its supplying mills—including Volco and Waterbury. The defendant is not a dealer in scrap metal. It does not acquire scrap metal for purposes of resale as waste, scrap or salvage. Rather, it sells its own scrap metal, which is a by-product of its manufacturing process, to one or more of the mills from which it has purchased the virgin metal.

Certain sales of brass mill scrap by the defendant to Volco and Waterbury are the subject matter of this action, specifically its sales to Volco between May 22, 1952 and October 15, 1952, and its sales to Waterbury between March 10, 1952 and December 1, 1952. The plaintiff claims that the defendant was not entitled to charge a quantity premium of 1¢ per pound in addition to the basic selling price f.o.b. point of shipment, and that by so doing it violated Ceiling Price Regulation 47 which was issued by the Director of Price Stabilization pursuant to the Defense Production Act of 1950, Executive Order 10161 (15 F.R. 6105) 50 U.S.C.A.Appendix, § 2071 note, and Economic Stabilization Agency General Order No. 2 (16 F.R. 738).

When Regulation 47 was issued the defendant notified Volco and Waterbury that it would be willing to sell scrap to these mills only in 40,000 pound lots; that when the defendant had 40,000 pounds of scrap ready for Volco or Waterbury it would send the appropriate mill its memorandum bill. It was the understanding between the defendant and these two mills that title to scrap in 40,000 pound lots passed to the purchasing mill and the scrap became the property of the purchasing mill when the

defendant sent its memorandum bill therefor.

There is no dispute as to the quantities of brass mill scrap sold by the defendant to Volco and to Waterbury but there is sharp disagreement between the parties as to the time when and the place where each sale was consummated, as to the quantities involved in each such sale, and as to the date of delivery by the defendant to the purchasing mill of the subject matter of each sale. The plaintiff claims that the date of each sale and of each delivery was the date when each quantity of scrap was picked up by the respective purchaser at the defendant's place of business and was loaded into the purchaser's truck. The defendant contends that, by its agreement with Volco and with Waterbury, a sale and delivery of 40,000 or more pounds of its scrap occurred and title to such scrap vested in the purchaser the moment the defendant mailed its memorandum bill to the purchaser and that, from that moment on, the defendant held the subject matter of the memorandum bill at the defendant's place of business as the property of and for the account of the purchasing mill. It is the defendant's contention, therefore, that each sale and delivery of scrap to Volco and to Waterbury occurred on one day, involved a quantity equal to or in excess of 40,000 pounds, and that the quantity premium charge of 1¢ per pound on each such 40,000 pound sale and delivery was authorized under Section 4 (2) of the Regulation.

The resolution of these divergent views determines whether or not the defendant was entitled to charge a quantity premium of 1¢ for each pound of brass mill scrap it sold and delivered to Volco and Waterbury between the dates hereinabove mentioned.

In order to be entitled to charge the quantity premiums authorized by Section 4(2) of the Regulation, the defendant must have delivered the specified quantity of scrap (within three consecutive calendar days, excluding Saturdays, Sundays and legal holidays) to a public carrier for transportation to the buyer's receiving point, or to the buyer at his receiving point in a conveyance owned by the seller, or "upon a conveyance owned or controlled by the buyer". The defendant claims that it complied with the latter of these three alternatives; that placing the scrap in the boxes, which are owned and controlled by the respective purchasers, constituted delivery to the buyer at his receiving point upon a conveyance owned or controlled by the buyer. The plaintiff contends that the boxes are receptacles, not conveyances. The proper construction, therefore, of the terms "conveyance" and "receiving point" of the buyer must be determinative of the issues herein. Neither term is defined in the Regulation, and neither counsel nor the Court has found a reported decision in which either of the terms "conveyance" or "receiving point" as used in the Regulation has been construed. It appears, therefore, that this is a case of first impression.

The noun "conveyance" connotes either a written instrument for conveying title to property or a vehicle—depending upon its context. In the latter sense, "conveyance" has been defined as:

"That by which anything is conveyed or transported, or which serves as a means or way of carriage, as any vehicle." Funk and Wagnall's New "Standard" Dictionary of the English Language, 1953.

and further

" * * * that by which anything is carried or borne along; any instrument of transportation from one place to another; specifically a carriage or coach, a vehicle of any kind. * * *" Weinberger Banana Co., Inc. v. Phoenix Assur. Co., Ltd., of London, 5 Cir., 1935, 74 F.2d 539, 540. See also, Ripley v. Railway Passengers' Assurance Co., 20 Fed. Cas. page 823, No. 11,854, affirmed Ripley v. Railway Passengers Ins. Co., 16 Wall. 336, 83 U.S. 336, 21 L.Ed. 469; Dunbar Molasses Corp. v. Home Ins. Co. of New York, D.C.

E.D.N.Y.1933, 3 F.Supp. 296, 300; Gatewood v. Continental General Life Ins. Co., D.C.Va.1927, 23 F.2d 211, 213.

Although the boxes in question are not within the dictionary definitions or the judicial interpretations of the word "conveyance", the defendant, by the magic wand of ingenious interpretation, would transmute a receptacle into a conveyance. Such magic may refresh fond recollections of Cinderella, the fairy godmother, the pumpkin and the coach, but it sheds no light upon the meaning of "conveyance" as used in the Regulation. The key to the living thought encased in the word "conveyance" is furnished by a reading of the entire Regulation, and there can be no doubt that that which is required by the Regulation to entitle a seller to a quantity premium is a delivery to the buyer at his receiving point upon a *vehicle* owned or controlled by the buyer or the seller, and that a skid, such as was employed herein, is not a vehicle in any sense. Note that in Section 5 thereof, providing for an additional charge in computing ceiling delivered prices, Regulation 47 makes allowance for delivery to the buyer's receiving point by a *vehicle* owned or controlled by the seller.

"Sec. 5. Ceiling delivered prices. The ceiling delivered price for brass mill scrap is the applicable ceiling price, f.o.b. point of shipment, determined in accordance with section 4 of this regulation, plus whichever of the following charges is applicable:

"(a) When delivery is made to the buyer's receiving point by a public (common or contract) carrier, an amount not in excess of the actual charge (including transportation taxes) made by such carrier;

"(b) When delivery is made to the buyer's receiving point by a vehicle owned or controlled by the seller, an amount not in excess of the lowest published and applicable motor common carrier charge (not including transportation taxes) for transporting the quantity of brass mill scrap being priced from the point, or points, of shipment to the buyer's receiving point. * * * "

On reading this section, and in consideration of the normal and customary usage of the term, and in further consideration of the stated purpose for which quantity premiums are made allowable by the Regulation, I conclude that the terms "conveyance" and "vehicle" must be considered as being used interchangeably therein.

■■■ The transactions under consideration fail to entitle defendant to a quantity premium for the further reason that there has been no delivery by Stimpson to a receiving point of either Volco or Waterbury. The defendant lays great stress upon its agreements with Volco and with Waterbury, as though such agreements (either formal and binding or informal and non-obligatory) can vary or have any effect upon the meaning and intent of the Regulation. It contends that, by virtue of these agreements, the locale of the boxes became the "buyer's receiving point"; that, therefore, the quantity premium may be charged because the defendant delivered the scrap to the buyer's receiving point by placing it into these boxes at the defendant's plant. The Regulation, when read as a whole, indicates clearly that no premium may be charged where the seller's shipping point and the buyer's receiving point coincide. The Regulation is instinct with the obligation of the seller to load the scrap (at its own cost) at the seller's shipping point into or upon a conveyance by which it is to be transported to another point, to wit, the buyer's receiving point. In fact, where the seller does not so load the scrap, it is not entitled to the basic ceiling price "f.o.b. point of shipment". Such a sale is defined in Section 4 as a sale "on a 'where is' basis", i.e., one which requires the buyer to load the scrap "in the conveyance in which it is to be transported". As to all such sales " * * * an amount no less than the cost to the buyer of loading the scrap in the con-

veyance in which it is to be transported must be deducted from the applicable price set forth in Table A", i. e., the basic ceiling price f.o.b. point of shipment. If this Court were to approve defendant's contention, it would permit defendant to effectively circumvent this requirement simply by following the expedient practice of denominating its own storage area as its buyer's receiving point, and by storing its scrap in boxes owned by the buyers rather than by itself. The Court cannot abet a private arrangement between a seller and buyers of brass mill scrap that seeks to evade and circumvent the Regulation, Section 3(3) of which provides:

> "No person shall evade or circumvent the provisions of this regulation by direct or indirect methods in connection with the sale, purchase, delivery or transfer of brass mill scrap, alone or in conjunction with any other commodity, or by way of any commission, service, transportation, or other charge or discount, premium, or other privilege, or by upgrading, trade understanding or otherwise."

And Section 3(1) nullifies any contract inconsistent with the Regulation, except insofar as it was entered into before June 21, 1951 and then only as to such sales and purchases of brass mill scrap thereunder

> " * * * if the material so delivered was purchased at a price in excess of the ceiling prices established herein and if before June 21, 1951, it was received by, or was in transit to, the person making delivery". Sec. 3(3)(b).

Although Regulation 47 does not define specifically what is meant by "receiving point", Section 7(g) thereof defines "point of shipment" as "the point at which brass mill scrap is loaded on a conveyance for transportation to the buyer's receiving point". It is absurd to consider that within such a definition "point of shipment" and "receiving point" can be taken to mean one and the same place. It is noted that the provisions of Section 5, quoted above, relating to "ceiling delivered prices" when delivery is made to the buyer's receiving point by a public carrier or by a vehicle owned or controlled by the seller, clearly indicate that the Regulation contemplates a buyer's receiving point as some place other than a seller's point of shipment. Furthermore, Section 4(2) permits a quantity premium where timely delivery of the requisite quantity of scrap is made to a public carrier for transportation to the buyer's receiving point, or to the buyer at his receiving point in a conveyance owned or controlled by the seller. I read these provisions as further indication of the fact that the seller's shipping point may not be regarded as the buyer's receiving point within the Regulation.

■ The Court concludes that the placing of the brass mill scrap into the boxes owned by Volco and by Waterbury and located at the defendant's plant did not constitute delivery of that scrap by the defendant to the buyer at his receiving point upon a conveyance owned or controlled by the buyer within the meaning of Section 4(2) of the Regulation. The Court concludes that the so-called voluntary agreements between the defendant and Volco and between the defendant and Waterbury are ineffectual to constitute the seller's f.o.b. point of shipment the buyer's receiving point. It follows that the date of each sale and delivery of brass mill scrap by the defendant to Volco and to Waterbury is the date of each delivery thereof by the defendant upon the truck or trucks of the respective purchasers. Upon the trial the plaintiff and the defendant stipulated as to the dates when Volco and Waterbury picked up their purchases of brass mill scrap at the defendant's plant and placed the same into their trucks. They also stipulated that, if the Court should find that these dates are the dates of each sale and delivery, the defendant has charged and collected excessive quantity premiums in the aggregate sum of $4,586.31. It was established at the trial that the poundage of brass mill scrap sold by de-

fendant during the year 1952 was in excess of 3,100,000 pounds and that the brass mill scrap sold to Volco and Waterbury aggregated approximately 22.3% of the total poundage sold during that year. The defendant has been engaged in its business for approximately 105 years. It is reasonable to assume that defendant is thoroughly familiar with all aspects of the purchase of virgin metal and the sale of its residual scrap. The testimony indicates that the defendant was aware of the purpose and the provisions of Regulation 47 and that it announced its intention to sell its scrap only in 40,000 pound lots and to regard the f.o.b. point of shipment as the buyer's receiving point in order to circumvent the provisions of the Regulation insofar as they relate to the charging of quantity premiums. The Court, therefore, awards to the plaintiff, in addition to attorney's fees and costs as hereinafter provided, an amount equal to two times the amount of the overcharges, to wit, the sum of $9,172.62. The defendant has failed to prove that its violation of Regulation 47 was neither willful nor the result of failure to take practicable precautions against the occurrence of the violation. 50 U.S.C.A.Appendix, § 2109(c).

The record reveals that the attorney for the plaintiff performed the following legal services in this case:

> prepared and had served the summons and the complaint;
>
> prepared and served a bill of particulars;
>
> examined the books and records of the defendant;
>
> prepared and served upon the defendant a notice to admit;
>
> prepared the case for trial;
>
> prepared and served a trial memorandum;
>
> tried this case (duration of trial was one and one-half hours).

The Court awards a counsel fee to the plaintiff in the sum of $250.

The Court finds that the plaintiff is entitled to judgment in its favor and against the defendant in the sum of $9,422.62, with interest and costs.

The attorney for plaintiff will, upon five days' notice, submit proposed findings of fact, conclusions of law and decree, not inconsistent with this opinion.